J-S04006-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDREW MAURICE WILEY | : | |
| | : | |
| Appellant | : | No. 1858 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 8, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000306-2023

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED APRIL 23, 2026**

Andrew Wiley appeals, *nunc pro tunc*,[1] from the judgment of sentence,

entered in the Court of Common Pleas of Montgomery County, after a jury

convicted him of attempted murder of a law enforcement officer (F-1),[2] assault

of a law enforcement officer,[3] aggravated assault,[4] firearms not to be carried

_____

[1] Wiley's direct appeal rights were reinstated via a Post Conviction Relief Act (PCRA) petition, **see** 42 Pa.C.S.A. §§ 9541-9546, on June 5, 2025. **See** Trial Court Opinion, 8/14/25, at n.1. Wiley filed the instant notice of appeal *nunc pro tunc* on July 3, 2025. **Id.**

[2] 18 Pa.C.S.A. § 2507(a).

[3] **Id.** at § 2702(a)(3).

[4] **Id.** at § 2702(a)(1).

without a license,[5] possession of instruments of crime,[6] and recklessly endangering another person (REAP).[7] After careful review, we affirm.

Wiley testified that on the morning of December 18, 2022, he woke up at his mother's home in southwest Philadelphia "feeling down." N.T. Jury Trial, 11/28/23, at 219, 232. Wiley smoked marijuana and drank two beers before deciding to go to the King of Prussia Mall (Mall) that afternoon to shop. *See id.* at 232. Wiley stated that shopping usually helped lift his mood, and the use of alcohol and drugs helped him cope with his depression. *See id.* at 220, 232-33. Wiley continued smoking and drinking an unknown quantity of alcohol on the thirty-minute drive to the Mall,[8] which he made in his red Nissan Juke. *See id.* at 233, 234. Wiley stated that he had a loaded firearm with him. *See id.* at 233-34.

When Wiley arrived at the Mall, he turned into a parking lot. *See id.* at 221. As he attempted to park his car, he did not notice a woman slowly pulling her car in front of his. *See id.* at 221. Wiley's vehicle struck the front of her vehicle, and he drove away. *See id.*

---

[5] *Id.* at § 6106.

[6] *Id.* at § 907(b).

[7] *Id.* at § 2705.

[8] Wiley testified that he "can't be very accurate with distance," and so he approximated the amount of time it took for him to get to the Mall. *See id.* at 233.

Upper Merion Township Police Officer Neil Campbell, who was on bike patrol that day, testified that he responded to a dispatch about a hit-and-run in the "green" parking lot at the Mall involving a red Nissan Juke. *See id.*, 11/27/23, at 160. He stated that he located a vehicle matching the description and license plate given over the dispatch, but that he could not see anyone in the vehicle at the time because the windows were heavily tinted. *See id.* at 160-61. While waiting for other officers to respond and assist him, Officer Campbell recalled seeing, through his peripheral vision, a figure climb out of the backseat of the red Juke and into the driver's seat. *See id.* at 162. Officer Campbell advised him to stop, but the person, later identified as Wiley, ignored him and pulled out of the parking lot at "a high rate of speed." *See id.* at 163. Officer Campbell radioed other officers that Wiley had fled. *See id.* at 165.

Upper Merion Township Police Officer Scott Samuels was on motorized patrol that day and also responded to the dispatch about a hit-and-run involving a red Nissan Juke. *See id.* at 68. Officer Samuels did not see Wiley's vehicle when he arrived at the "green" parking lot, but later heard Officer Campbell on the radio reporting that Wiley had fled the scene. *See id.* at 68, 70. Upon receiving that information, Officer Samuels exited the parking lot and drove in the reported direction of Wiley's vehicle. *See id.* at 71. After seeing Wiley's vehicle pass him going the opposite direction in traffic, Officer Samuels turned around and followed the red Nissan Juke until both vehicles

were stopped at a red light. *See id.* at 73-74. While stopped at the light, Officer Samuels was able to maneuver his vehicle so that he was almost directly behind Wiley's car in the far-right lane of traffic; Officer Samuels then turned on his emergency lights, which activated the dashboard camera in his patrol car. *See id.* at 75-76, 93. As Officer Samuels did this, Wiley turned his vehicle to the right, proceeded to drive off the road, over a curb and through a grassy area, and then down over a wall, which Officer Samuels estimated was about a four-foot drop. *See id.* at 76.

Wiley's vehicle landed in a lower parking lot on all four wheels. *See id.* at 77. Officer Samuels testified that "[t]he back of the car was only a few feet away from that wall. It didn't go very far[.]" *Id.* Officer Samuels then pulled his car as close as he could to the wall that Wiley drove over, got out, and hopped down the four-foot drop to approach Wiley in the parking lot below. *See id.* at 78. As he approached the red Juke, Officer Samuels saw the driver's side door of Wiley's vehicle swing open and viewed Wiley sitting in the driver's seat. *See id.* at 79. Officer Samuels then testified:

> [Wiley] turned his body towards me. He looked at me. We made eye contact. He kind of mumbled something under his breath. I couldn't really hear or understand what he was saying. It was too quiet, but it was like he was saying something to himself, but he kind of said something, and then he turned his body back into the car.
>
> * * *
>
> I could see that he turn[ed] his body further into the car. And I could see his right shoulder and his head area, like, dip down as if he's reaching for something. I can't—from where I'm standing

at that point, I can't see his hands, but I could see a movement, like, further into the car, like, in the center console area.

\* \* \*

He then turns back [] towards me to get out of the car. He gets out of the car very quickly. He stands up, he turns, he faces me over, faces me straight on. We're looking right at each other. And I see that he has a black handgun in his hand, and he starts shooting at me.

*Id.* at 79-82. Officer Samuels stated that he was in the process of drawing his gun when Wiley first fired gunshots at him. *See id.* at 83. At that point, Officer Samuels returned fire and sought cover. *See id.* Officer Samuels positioned himself behind a black SUV, parked a few feet to the left of Wiley's vehicle, and continued to return fire. *See id.* at 86. After moving to the back of the SUV, Officer Samuels saw Wiley lying on the ground with his handgun out of his hands. *See id.* at 87.

At this point, Seargent Chris Dolga of the Upper Merion Township Police Department arrived at the scene. *See id.* at 88. Together, he and Officer Samuels approached Wiley and held him at gunpoint. *See id.* at 89. Wiley was lying with his eyes closed, not moving. *See id.* The officers kicked Wiley's gun away from him, placed him in handcuffs, and immediately administered medical attention, as Wiley had gunshot wounds to his thigh and ankle. *See id.* at 89-91. After the incident was over, Officer Samuels realized that he had not yet turned his body camera on, and, at that point, he pushed the button to start recording. *See id.* at 93-94. Wiley became alert once he was in handcuffs and, although he was agitated, cooperated with the police. *See id.* at 92.

- 5 -

Wiley's account of the events that took place is similar to the narrative that Officer Samuels testified to at trial. Wiley admitted fleeing from the parking lot after the hit-and-run, driving through traffic, and then going off the road and over a wall into a lower-level parking lot. *See id.*, 11/28/23, at 222. However, Wiley testified that as he drove down over the wall, his gun discharged accidentally and shot him in the thigh. *See id.* at 222-23. At that point, his door opened, and he "just aimed out the car and shot." *See id.* at 223. Wiley testified that he never got out of his vehicle before shooting. *See id.* at 244. He also stated that he "didn't notice the officer at first," and he was "just firing, just to shoot." *See id.* Wiley further testified that he wanted the police to shoot him, so that they could end his life for him. *See id.* at 223. He stated that he saw the police pull up behind him before shooting his weapon, *see id.* at 224, but that after he drove over the wall, he did not notice anyone else. *See id.* at 225. Wiley also testified to aiming his gun at an officer, but stated that it was not his intention to do so. *See id.* Neither Wiley nor Officer Samuels could remember how many shots each person fired at the other during the incident. *See id.* at 245; *id.*, 11/27/23, at 84.

Three eyewitnesses also testified at Wiley's trial. Cynthia James had just finished having lunch with a friend at a restaurant adjacent to the parking lot when she heard a loud metal scraping sound. *See id.*, 11/28/23, at 133-34. She described seeing the car in the parking lot and watching its "big wide door" swing open. *See id.* at 134. James testified she saw an outstretched arm come out of the car with a gun in hand. *See id.* She then heard lots of

"bangs," estimating that around twenty shots were fired. ***See id.*** at 135. James believed that the shooter was still in the car when he was shooting. ***See id.*** She also described seeing the shooter point and shoot his gun towards the wall, where police officers were visibly positioned. ***See id.*** at 136-37.

The second eyewitness, Oscar Beisert, was stopped at a red light in his vehicle a couple lanes of traffic away from the parking lot where the incident took place. ***See id.*** at 16. Beisert got to the light after Wiley had already driven off the road and down over the wall. ***See id.*** at 24. From his car, Beisert could see people jumping into the parking lot,[9] which was a little below street level. ***See id.*** at 17. He described seeing a man exit a red car that was sitting in the parking lot. ***See id.*** Beisert stated that once the man got out of the red vehicle, the man turned around within a few seconds and opened fire with his weapon. ***See id.*** at 17-18. At that point, Beisert drove off because he was scared that he might get caught in the crossfire. ***See id.*** at 17. Beisert testified that he heard "many shots" before driving away. ***See id.*** at 19. Beisert also stated that it looked like the shooter was "turning to confront" the people who were dropping down into the parking lot. ***See id.*** at 24, 25.

The last eyewitness to testify was Cauldon Quinn. Quinn, a former naval officer, ***see id.*** at 183-86, stated that on December 18, 2022, he was also stopped at a red light about fifteen yards from the parking lot when he noticed

---

[9] Beisert testified that from where he was in his car, he could not tell if the men jumping down into the parking lot were police officers. ***See id.*** at 17.

police vehicle lights turn on. ***See id.*** at 189, 192. Quinn then heard a "bang," which he later determined was Wiley's vehicle going over the wall and into the lower parking lot. ***See id.*** Quinn next noticed a police officer doing a "tactical shuffle" across the grassy area right before the wall. ***See id.*** As the police officer came down to approach the vehicle in the parking lot below, Quinn observed the vehicle's driver-side door swing open and saw a shoulder and a right hand extend out of the door. ***See id.*** at 190. He then heard a "pop, pop, pop," and witnessed the police officer stumble, a bit startled. ***See id.*** Quinn saw the police officer recover, draw his weapon, and return fire. ***See id.*** After returning fire, the officer moved to get more cover. ***See id.*** at 191. The man in the vehicle let off a second round of gunshots, and Quinn stated that, at that point, Wiley had "turned more towards me. I could see more of [Wiley] at this point." ***See id.*** The police officer then returned fire with "far more accuracy," and Wiley "rolled out of the car writhing in pain." ***Id.*** Quinn described the gunfire from Wiley as "clearly pointed at the movement of the police officer in both instances." ***Id.*** at 194.

At the conclusion of trial on November 29, 2023, the jury convicted Wiley of the above-mentioned offenses. On March 8, 2024, the court sentenced Wiley to an aggregate term of 25 to 50 years' imprisonment. ***See*** N.T. Sentencing Hearing, 3/8/24, at 30-31. Wiley filed a timely post-sentence motion on March 15, 2024, which was subsequently denied on April 30, 2025. Wiley did not file a direct appeal. Wiley filed a PCRA petition to reinstate his appeal rights, which the PCRA court granted. ***See supra*** at n.1. This *nunc*

*pro tunc* appeal followed. Wiley filed a timely court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He presents two issues for our review:

> (1) Whether the evidence adduced at trial was sufficient to sustain Wiley's conviction of attempted murder of a law enforcement officer and aggravated assault of a law enforcement officer?
>
> (2) Whether the jury's verdict finding Wiley guilty of attempted murder of a law enforcement officer and aggravated assault of a law enforcement officer went against the weight of the evidence presented at trial?

**See** Appellant's Brief, at 7, 9.[10]

Wiley first contends that the evidence presented at trial was insufficient to sustain his attempted murder conviction. Specifically, Wiley argues that the evidence at trial was insufficient to prove he had the requisite intent to

---

[10] In his Statement of Questions Involved, Wiley attempts to argue insufficiency of the evidence and that the verdict was against the weight of the evidence with regard to his REAP conviction. **See** Appellant's Brief, at 3. However, as the Commonwealth correctly points out, because Wiley failed to include these issues in his Rule 1925(b) statement or argue it specifically in his brief, these claims are waived. **See** Pa.R.A.P. 1925(b)(4)(vii); Pa.R.A.P. 2119(a), (e).

Additionally, although listed as an issue in his Statement of Questions Involved, Wiley does not present any argument addressing the insufficiency of evidence pertaining to his intent for the aggravated assault conviction. Thus, we find that claim waived. **See** Pa.R.A.P 2119 (a), (e). However, even if it were not waived, because the criminal intent needed to commit attempted murder is "greater than and necessarily includes" the intent required to commit aggravated assault, and because we find, **infra**, that there was sufficient evidence to sustain the jury's verdict of attempted murder, he would be entitled to no relief. **See Commonwealth v. Anderson**, 650 A.2d 20, 24 (Pa. 1994).

commit first-degree murder, a necessary element of attempted murder. **See id.** at 9; **Commonwealth v. Geathers**, 847 A.2d 730, 734 (Pa. Super. 2004).

The standard of review for sufficiency claims is set forth below:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim, the court is required to view the evidence in the light most favorable to the verdict winner[,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

**Commonwealth v. McClelland**, 204 A.3d 436, 441 (Pa. Super. 2019) (citation omitted).

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). Attempted murder is defined as the intent to kill, deliberately and premeditatedly, plus a substantial step towards carrying out that intent. **See id.** at § 2502(a); **Commonwealth v. Bracey**, 662 A.2d 1062, 1066 (Pa. 1995); **Commonwealth v. Predmore**, 199 A.3d 925, 929 (Pa. Super. 2018). It is well-established that attempted murder is attempted *first-degree* murder, meaning the accused must have had the specific intent to kill when he or she "takes a substantial step toward killing the victim." **See Predmore**, **supra**, at 930.

The Supreme Court of Pennsylvania has held that "the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill." *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) (citation omitted). In attempted murder cases, this intent can be inferred when the defendant discharges a firearm at an individual, even if that shot misses the individual. *See Commonwealth v. Cross*, 331 A.2d 813, 814 (Pa. Super. 1974). The Commonwealth may prove any element of the crime, including specific intent to kill, by wholly circumstantial evidence. *See Commonwealth v. Perez*, 93 A.3d 829, 841 (Pa. 2014).

In the instant case, Wiley's testimony at trial established that he was depressed at the time of the incident and under the influence of drugs and alcohol. *See* N.T. Jury Trial, 11/28/23, at 215, 221. He also testified that he was feeling suicidal, even holding a gun to his own chin before seeing an officer approach his vehicle in the "green" parking lot and deciding to flee. *See id.* at 222. After evading police and his vehicle stalling, Wiley stated that the door opened, and he started firing without seeing anything or anyone. *See id.* at 223-24. Wiley admitted that he aimed the gun at the officer, but "that was not [his] intention." *See id.* at 225. He stated that his main intention in discharging his weapon was "[t]o startle, to get [him]self hurt, to just have pain inflicted upon [him]." *See id.* at 225-26.

However, eyewitnesses to the crime had different interpretations as to what Wiley may have been intending when he discharged his weapon. Officer

Samuels stated that once he arrived at the area where Wiley's vehicle had come to rest, the driver's side door "quickly swung open" and Wiley "turned his body towards" him. *See id.*, 11/27/23, at 79. Officer Samuels testified that he and Wiley "made eye contact," and then Wiley turned back around, grabbed his gun, got out of the car, faced Officer Samuels again, and began shooting at him. *See id.* at 81-82. James, an eyewitness to the shooting, testified that she saw Wiley's arm extend from his vehicle with a gun-in-hand and point it towards the wall where Officer Samuels was standing before she heard a "bang," followed by several more shots. *See id.* at 134, 137. Beisert, another eyewitness, testified that he saw Wiley exit his vehicle with his back facing the wall, and then quickly turn around and begin shooting. *See id.*, 11/28/23, at 17. Finally, a third eyewitness, Quinn, stated that he saw Wiley's car door swing open and "a shoulder and a [] right hand swing around," after which gunshots followed in the direction of the officer. *See id.* at 190, 194.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, *see McClelland*, *supra*, we hold that there was sufficient evidence for the jury to convict Wiley of attempted murder of a law enforcement agent. Officer Samuels testified that he and Wiley "made eye contact" before Wiley fired his weapon at him, indicating that Wiley knew who and where he was going to shoot. *See* N.T. Jury Trial, 11/27/23, at 81-82. Further, Officer Samuels stated that after he and Wiley made eye contact, Wiley turned around in his car to grab the weapon, before turning back around

to face the officer and shoot at him. *See id.* These moments, though brief, reflect Wiley's premeditation and deliberation, as he saw Officer Samuels, decided that he should pick up his weapon, and then took the "substantial step" of firing it at the officer. *See id.*; *Bracey*, *supra*; *Predmore*, *supra*.

While Officer Samuels' testimony alone is sufficient to establish Wiley's intent to kill, the three eyewitnesses also testified that Wiley was pointing and shooting his gun in the officer's direction. *See* N.T. Jury Trial, 11/27/23, at 134, 137; *id.*, 11/28/23, at 17, 190, 194. All of this testimony—combined with the dashcam footage introduced through Lieutenant Marc Azeff[11] and the physical evidence of gunshot marks on the wall and SUV near Officer Samuels[12]—is sufficient evidence to show that Wiley had the intent to kill Officer Samuels when he discharged his weapon. Although Wiley testified that he did not have that intent and that he fired his gun "indiscriminately," it was within the province of the factfinder to accept or reject this testimony and find accordingly.

_____

[11] At trial, Lieutenant Azeff narrated the dashcam footage from Officer Samuels' police vehicle. The footage was played to the jury in slow motion and showed a projectile discharged from Wiley's handgun striking the wall behind Officer Samuels. *See id.*, 11/27/23, at 122-25.

[12] Detectives Terrence Lewis and David Schanes of the Montgomery County Detective Bureau testified at trial as to ballistic evidence found at the scene of the crime. *See id.*, 11/28/23, at 30, 87. Notably, they both observed damage to the wall near where Officer Samuels stood during the shooting, consistent with discharged projectiles from Wiley's handgun. *See id.* at 58, 88-92.

In his second issue, Wiley argues that the jury's verdict of attempted murder and aggravated assault of a law enforcement officer was against the weight of the evidence. Specifically, Wiley avers that his testimony about his state of mind and intention to end his own life was sufficient to raise reasonable doubt in the jury's mind as to his motive or intent in shooting at Officer Samuels. *See* Appellant's Brief, at 10.

> The standard and scope of review for weight claims is as follows:
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Bright*, 234 A.3d 744, 749 (Pa. Super. 2020) (citation omitted). Abuse of discretion occurs when the trial court overrides or misapplies the law, exercises judgment that is manifestly unreasonable or is "the result of bias, prejudice, ill-will[,] or partiality as shown by evidence of record." *Commonwealth v. Lloyd*, 336 A.3d 1032, 1035 (Pa. Super. 2025) (citation omitted). Additionally, in reviewing a challenge to the weight of the evidence, "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa.

2000). Rather, the verdict must be "so contrary to the evidence as to shock one's sense of justice." ***Commonwealth v. Forbes***, 867 A.2d 1268, 1273 (Pa. Super. 2005) (citation omitted).

In addressing the weight of the evidence with regard to Wiley's intent to commit attempted murder and aggravated assault of a law enforcement officer, the trial court noted:

> During closing argument[,] trial counsel attempted to undercut Officer Samuels' testimony and question the credibility of his factual account. Counsel argued the officer's testimony that [Wiley] got out of his car before he began shooting [] was not supported by two of the eyewitnesses, [] James and [] Quinn. More specifically, counsel noted that the eyewitnesses' testimony was that [Wiley] shot at the officer from inside his car. However, this difference in testimony [] does not in any way minimize the officer's testimony and the testimony of [] James and [] Quinn that [Wiley] shot directly at the officer [] is a crucial fact in the intent analysis. In this instance, all three witnesses' testimony was in agreement. Additionally, the jury was free to make credibility determinations. Despite [Wiley's] testimony that he [did not] see Officer Samuels before he started shooting and that he was not shooting at anything or anyone in particular, the jury was permitted not to credit his version of events. Therefore, the verdict was not so contrary to the evidence as to shock one's sense of justice.

Trial Court Opinion, 8/14/25, at 13. After reviewing the record, we conclude that trial court did not abuse its discretion in finding that the jury verdict was not against the weight of the evidence. While Wiley's testimony established that he was depressed and under the influence of alcohol and drugs at the time of the incident, the jury[13] could still have found that Wiley formed the

_____

[13] We note that the jury was also charged with voluntary intoxication as a defense to attempted murder.

- 15 -

requisite intent to satisfy the elements of the crime. *See* N.T. Jury Trial, 11/29/23, at 10-11, 108.[14]

Moreover, even though Wiley challenges the jury's conclusion that he intended to shoot Officer Samuels, the evidence supports the fact that Wiley aimed and discharged his weapon directly at Officer Samuels. Taking the eyewitness testimony, dashcam footage, and physical evidence collected from the crime scene together, it was not unreasonable for the jury to find that Wiley had the specific intent to kill Officer Samuels. Accordingly, the verdict was not so contrary to the evidence presented at trial as to "shock one's sense of justice." *See Forbes*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/23/2026

---

[14] We also recognize that Wiley never challenged the intent element on the basis that he did not know what he was doing at the time of the car accident or shooting due to his depression or intoxication.

- 16 -